IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRUCE WORTHY, | § | |
| | § | No. 290, 2014 |
| Defendant Below, | § | |
| Appellant, | § | Court Below - Superior Court |
| | § | of the State of Delaware in |
| v. | § | and for Sussex County |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID. No. 1310012858 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: August 5, 2015
Decided: August 6, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court. **REVERSED**.

Santino Cecotti, Esquire, Office of the Public Defender, Wilmington, Delaware, for Appellant Bruce Worthy.

Maria T. Knoll, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellee.

**SEITZ**, Justice:

# I. INTRODUCTION

The defendant, Bruce Worthy, allegedly threatened his mother and brother with a gun. Worthy's mother, Valerie Coleman, called 911 to report the threat, leading to Worthy's arrest and a number of criminal charges. At trial, Coleman was one of the State's main witnesses.[1] The State subpoenaed Coleman to testify, but she failed to appear at trial. The State tracked her down and put her in jail on a material witness capias.[2] When the State brought her from jail to testify, Coleman was uncooperative and tried to end her testimony by "plead[ing] the Fifth."[3]

The trial judge removed the jury and spoke with the prosecutor, who in response to prompting from the trial judge, said that the State was giving Coleman "full immunity . . . [o]n everything,"[4] including perjury. The trial judge instructed Coleman that "[e]ven if you commit a crime by your testimony the State has basically said that you cannot be prosecuted."[5] Coleman reluctantly continued her testimony after the judge's instruction. A jury found Worthy guilty of aggravated menacing against Coleman, but acquitted him on all other counts.

---

[1] App. to Answering Br. at 2-3.
[2] *Id.*; App. to Opening Br. at 25(a).
[3] App. to Answering Br. at 7-12; App. to Opening Br. at 25(a).
[4] App. to Opening Br. at 25(b).
[5] *Id.* at 25(c).

On appeal, Worthy argues that the prosecutor erred in granting Coleman immunity against prosecution for perjury, and that the legal error was not harmless beyond a reasonable doubt. We agree, and reverse and remand for a new trial.

## II. BACKGROUND

In the late evening hours on October 20, 2013, Bridgeville Police Officer John Cullen responded to a 911 call from Coleman at 311 Delaware Avenue, Bridgeville, Delaware.[6] Coleman called the police because Worthy was "running around here with a gun."[7] In the course of the call, she stated repeatedly, "he point the gun at me."[8] Coleman also said that Worthy was leaving the house and driving away in "a 1986 F-150."[9]

A few minutes later, Bridgeville Police Officer Nicolas DeMalto saw a white Ford F-150, matching the description sent out over dispatch after Coleman's 911 call.[10] Officer DeMalto turned on his patrol car lights and chased the pickup truck.[11] Worthy, driving the F-150, ignored DeMalto's lights and drove back to 311 Delaware Avenue with DeMalto in pursuit.[12] Officer DeMalto eventually stopped and arrested Worthy at the house. When DeMalto asked Worthy about

---

[6] *Id.* at 23; Answering Br., Exhibit A.
[7] Answering Br., Exhibit A.
[8] *Id.*
[9] *Id.*
[10] App. to Answering Br. at 20-22.
[11] *Id.* at 22-24, 29.
[12] *Id.* at 28-29, 33-34.

having a gun in the house, Worthy claimed it was a beer can and not a gun.[13] The police did not find a weapon in Worthy's vehicle.[14] Worthy was taken to Nanticoke Hospital for a blood draw on suspicion of driving while intoxicated.[15] His blood alcohol level measured 0.14.[16]

Officer Cullen interviewed Coleman and her other son, Troy Worthy ("Troy"), in the early morning hours of October 21.[17] According to Cullen, Coleman said she argued with Worthy, who left the house but then "came inside, kicked in the back door, had the gun, was pointing it and waving it at both of them."[18] Officer Cullen testified at Worthy's trial that Troy agreed with this sequence of events. Coleman and Troy both provided the police with written and recorded statements.[19]

A Sussex County grand jury indicted Worthy on December 16, 2013, on twenty-four charges: two counts of aggravated menacing, for pointing a gun at Coleman and Troy; two counts of possession of a firearm during the commission of a felony; two counts of terroristic threatening; one count of possession of a firearm by a person prohibited; one count of driving a motor vehicle under the

---

[13] *Id.* at 27-28.
[14] *Id.* at 27.
[15] *Id.* at 29-30.
[16] *Id.* at 30-31.
[17] App. to Opening Br. at 98-99.
[18] *Id.* at 99.
[19] App. to Answering Br. at 19; App. to Opening Br. at 26-27, 85-86.

influence; and sixteen other motor vehicle charges.[20] Worthy pled guilty to driving under the influence and the other motor vehicle charges, and went to trial in March 2014 on the weapons, aggravated menacing, and terroristic threatening charges.[21]

The State served Coleman and Troy with subpoenas to appear to testify at trial.[22] Both failed to appear.[23] The prosecutor told the Superior Court that during their interviews in preparation for trial, Coleman and Troy told the prosecutor that Worthy contacted them from prison.[24] The Superior Court granted the State's request for material warrant capiases for Coleman and Troy, who were located and put in jail.[25]

When the State brought Coleman from jail and called her as a witness at trial, she was "argumentative."[26] She backtracked on her prior statements about Worthy waving a gun. "I assume I saw a gun," she said.[27] "I don't know if it was keys or a gun, but I said it was a gun and I thought it was . . . . I didn't say specific that it was a gun."[28] The prosecutor asked Coleman if she blamed the State for putting her in jail.[29] Coleman said that she did and felt, "if I didn't want to be here,

---

[20] App. to Opening Br. at 5-10 (Indictment).
[21] *Id.* at 3-4, 11.
[22] App. to Answering Br. at 2-3.
[23] *Id.* at 3.
[24] *Id.*
[25] *Id.*; Answering Br. at 7; App. to Opening Br. at 25(a), 77.
[26] Answering Br. at 9.
[27] App. to Answering Br. at 7.
[28] *Id.* at 8.
[29] App. to Opening Br. at 25(a).

I shouldn't have to be here."[30] At that point, she stated, "And as of now . . . I plead the Fifth. I don't want to say anymore."[31] The prosecutor showed Coleman her prior written statement and she responded, "I still plead the Fifth."[32]

The Superior Court removed the jury and the following colloquy ensued among the judge, prosecutor (Gelof), Coleman, and her defense attorney (Stumpf):

> THE COURT: Mr. Gelof, as to the potential of a, quote, false report and the witness's desire to rely on the Fifth Amendment of the Bill of Rights, is the State going to offer her immunity?
>
> MR. GELOF: Yes, she has – she's not facing the potential for any criminal prosecution other than perjury.
>
> THE COURT: Well, that is –
>
> MR. GELOF: I mean, that's –
>
> THE COURT: She could take the Fifth. Are you offering her full immunity?
>
> MR. GELOF: Yes.
>
> THE COURT: On everything?
>
> MR. GELOF: Yes.
>
> THE COURT: Ma'am, what that means is, you have no Fifth Amendment right. The State will not prosecute you. You only have a Fifth Amendment right to not testify against yourself. Since the State is basically saying that whatever you say here today cannot ever be used against you for a crime, you will be required to testify. Do you understand that? It's not your personal choice. The State –

---

[30] *Id.*
[31] *Id.*
[32] *Id.*

5

THE WITNESS: So I can't plead the Fifth?

THE COURT: You can't plead the Fifth because there's no possible crime you could commit. Even if you commit a crime by your testimony, the State has basically said that you cannot be prosecuted.

THE WITNESS: Okay.

THE COURT: All right.

MR. STUMPF: Your Honor, if I may, this is a little bit of new territory for me, but I would object in that it seems the State has just given Ms. Coleman carte blanche to lie and with no repercussion which absolutely voids the oath which she's taken on the stand –

THE COURT: I don't think they've given her carte blanche to lie.

MR. STUMPF: They just said that they wouldn't prosecute her for perjury.

THE COURT: They said they wouldn't prosecute her for anything. All right? So the jury will decide, ultimately, as you said, the truth. All right? And if you want to bring this out on cross-examination that she has been offered immunity, whatever she says, you can do so. That goes to her bias, etcetera.[33]

The prosecutor continued with his direct examination of Coleman and had Coleman read to the jury her prior written statement that Worthy had pointed a gun at her.[34] Coleman read the statement, in the State's view, "reluctantly."[35] She continued to testify that she was not sure whether Worthy had a gun in his hand.[36]

---

[33] *Id.* at 25(b)-25(d).
[34] *Id.* at 26-31; Answering Br. at 9-10.
[35] Answering Br. at 9.
[36] App. to Opening Br. at 38, 41-43, 45, 48, 50, 52.

Troy followed her lead and testified to the same doubts.[37] The State treated them both as hostile witnesses.[38] Their testimony, along with their earlier statements to police and a recording of Coleman's 911 call, were the only evidence presented at trial.

The jury found Worthy guilty of one charge of aggravated menacing as to Coleman, and not guilty on all the remaining charges.[39] Worthy was then sentenced as a habitual offender to 18 years in prison.

## III.   ANALYSIS

Worthy argues on appeal that the Superior Court erred as a matter of law in granting Coleman immunity from prosecution for perjury. We agree. Under Delaware law, the Superior Court cannot grant a witness immunity from perjury.

"The power of government to compel persons to testify in court or before grand juries or other governmental agencies is firmly established in Anglo-American jurisprudence."[40] At the same time, there are "a number of exceptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination."[41] The Fifth Amendment to the

---

[37] *Id.* at 83, 87; App. to Answering Br. at 15-16.
[38] App. to Opening Br. at 34.
[39] *Id.* at 115-16.
[40] *Kastigar v. United States*, 406 U.S. 441, 443 (1972).
[41] *Id.* at 444.

United States Constitution provides in relevant part that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself . . . ."[42]

Immunity statutes "seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify."[43] Under the Delaware immunity statute, the Superior Court can compel testimony from witnesses refusing to answer questions due to self-incrimination. It also provides certain protections against prosecution.[44] But the statute contains an explicit perjury exception:

> In no event, however, shall such person, acting pursuant to such order [granting immunity], be exempt from prosecution or penalty or forfeiture for any perjury, false statement or contempt committed in answering or failing to answer, or in producing or failing to produce evidence in accordance with the order, and any testimony or evidence so given or produced shall not by virtue of this section be rendered inadmissible in evidence upon any criminal action, investigation or proceeding concerning such perjury, false statement or contempt.[45]

Under the statute, the Superior Court erred in granting Coleman immunity from perjury. On appeal, the State has no real response to this error, saying only that it "does not agree that by providing Coleman with immunity, she was also free

---

[42] U.S. Const. amend. V.; *see also* Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself or herself . . . .").

[43] *Kastigar*, 406 U.S. at 446; 11 *Del. C.* § 3506.

[44] 11 *Del. C.* § 3506.

[45] *Id.* An implied perjury exception exists under the federal immunity statute because "it cannot be conceived that there is power to compel the giving of testimony where no right exists to require that the testimony shall be given under such circumstances and safeguards as to compel it to be truthful." *Glickstein v. United States*, 222 U.S. 139, 142 (1911).

from the specter of possible perjury charges."[46] The State never explains how this could be so, given the undisputed trial record where the Superior Court told Coleman that she could not be prosecuted for any crime.

The State's main argument on appeal rests on harmless error. Under a harmless error analysis, the defendant must first prove, as he has done here, that there was error. The burden then shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt.[47] This Court considers "both the importance of the error and the strength of the other evidence presented at trial. An error may be important if, for example, it concerned a witness giving significant testimony or if it concerned evidence obtained only through testimony erroneously admitted."[48]

The State argues that the grant of immunity for perjury was harmless because Worthy had the opportunity to cross-examine Coleman on her understanding of the grant of immunity, as well as her inconsistent statements. It also contends that Coleman's testimony was not necessary to convict Worthy because other evidence existed that was sufficient to convict Worthy, such as Coleman's 911 call recording and Troy's statement to police.[49]

---

[46] Answering Br. at 14.

[47] *Williams v. State*, 98 A.3d 917, 922 (Del. 2014) (quoting *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992)).

[48] *Van Arsdall v. State*, 524 A.2d 3, 10 (Del. 1987).

[49] Answering Br. at 19-21.

Worthy argues in response that the Superior Court's error was not harmless beyond a reasonable doubt because Coleman was "the State's star witness,"[50] particularly with respect to the charge of aggravating menacing as to her – the only charge for which Worthy was found guilty. Worthy also points to the fact that Coleman's testimony allowed the State to introduce into evidence Coleman's out-of-court statements about Worthy pointing a gun at her.[51] As evidence that Coleman's testimony contributed to the guilty verdict, Worthy cites the Superior Court's finding that Coleman could be incarcerated on a material witness capias. Evidence is material, Worthy claims, "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."[52]

We agree with Worthy that the State has not proven that the trial court's error in granting Coleman immunity from perjury was harmless beyond a reasonable doubt. The police did not find a gun in Worthy's car or in the house, leaving Coleman's and Troy's trial testimony and statements to the police and Coleman's 911 call recording as the only evidence to convict Worthy. Coleman was a central witness in the trial. It is plausible, as the defense argued at trial, that Coleman and Troy simply wanted the police to get Worthy out of the house in his drunk and disruptive state. The jury thus had to make a credibility determination

---

[50] Opening Br. at 12.
[51] *Id.*
[52] Reply Br. at 4-5 (quoting *Cole v. State*, 959 A.2d 18, 23 (Del. 2008)).

whether their testimony at trial about being mistaken about seeing a gun was more credible than the statements to the police and the 911 call.

In making that credibility determination, the offer of "full immunity" to Coleman was highly relevant. She failed to appear at trial, was aggravated at being arrested and put in jail, and might not have wanted to be the cause of a long prison sentence for her son. Knowing that she was immune from any consequences for lying under oath could have persuaded the jury to believe her earlier statements to the police, which incriminated Worthy, over her trial testimony, which tended to exculpate him.

We recognize that an overbroad grant of immunity could also be viewed as giving Coleman free rein to testify favorably in Worthy's defense, and that the jury instead apparently rejected her trial testimony. But Coleman's testimony was central to the prosecution's case and an untainted testing of her credibility was indispensable for the jury to determine the weight to be given to the statements made during her 911 call and to the police after the incident.

We believe that it would be hazardous to speculate after the fact what effect exempting a witness from a major portion of the affirmation that all witnesses must give—acknowledging that they face possible prosecution for perjury if they testify untruthfully—had on the witness' testimony or the jury's reaction to it. When a witness is critical to the State's case, as was the situation here, that witness must be

subject to the consequences for perjury faced by all other witnesses. Although it is doubtless the case that the ritual of requiring a witness to affirm her duty to testify truthfully under penalty of perjury does not deter all witnesses from lying on the stand, our law regards this affirmation as a baseline requirement of justice in all cases, civil or criminal, and one that plays a useful role in producing good faith testimony. When the consequences are as important as those faced by a defendant in a felony trial, we cannot deem the elimination of this fundamental requirement as to an important prosecution witness to be harmless beyond a reasonable doubt.

## IV. CONCLUSION

The Superior Court erred in granting Coleman immunity from perjury. The error was not harmless beyond a reasonable doubt. We therefore reverse and remand to the Superior Court for a new trial.