******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BEAR, J., concurring in part and concurring in the judgment. The defendant, Kevan Simmons, appeals from the judgment of conviction, rendered following a jury trial, of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), and one count each of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that (1) the prosecutor violated his constitutional rights to due process and a fair trial by committing improprieties during closing argument; (2) his due process rights were violated when the state failed to disclose a police internal affairs report detailing the misconduct of a police detective who was a primary witness for the state; and (3) the state improperly entered into an agreement to immunize testimony from George Harris, a victim of the shooting and a key witness, including any lies and falsehoods that would constitute the crime of perjury, and that agreement constituted plain error that was either structural error or otherwise not subject to a harmless error analysis; and (4) the improper agreement to immunize Harris' testimony, which the state anticipated would include Harris' perjury in denying knowledge, inter alia, about who shot him, warrants the exercise of this court's supervisory authority to reverse the defendant's conviction and award him a new trial.[1]

I agree with the majority that the state's illegal and improper agreement with Harris to immunize all of his anticipated testimony, including any testimony that the state anticipated would constitute the crime of perjury, and the trial court's knowing acceptance and implementation of that illegal and improper agreement, warrants a reversal of the defendant's conviction and a remand of this case for a new trial. I write separately, however, because I do not agree that the majority's invocation of this court's supervisory authority in its thorough, thoughtful, and well written opinion is necessary in this case. I would, instead, reverse the defendant's conviction on the ground that the trial court's acceptance and implementation of the agreement for the illegal and improper immunization of Harris' anticipated testimony, including any testimony that would constitute the crime of perjury, constituted plain error that was structural error in the context of the defendant's criminal trial.[2]

Before addressing the defendant's claim of plain error, I discuss the other claims raised by the defendant in support of his argument that the conviction should be reversed to determine whether reversal is warranted on a basis separate from plain error review.

I accept the facts as set forth in the majority opinion. Additional facts are set forth as relevant to the claims that are addressed in this concurring opinion.

## I

### PROSECUTORIAL IMPROPRIETY

The defendant first claims that the prosecutor violated his rights to due process and a fair trial when he committed several improprieties during closing argument. Specifically, the defendant claims that the prosecutor improperly (1) denigrated defense counsel; (2) asked the jury to use impeachment evidence substantively; (3) expressed his opinion about the credibility of two witnesses; (4) appealed to the jurors' emotions; and (5) injected extraneous matters into the trial. The state argues that the prosecutor did not commit any improprieties during closing argument and that, even if he did, they did not deprive the defendant of his rights to due process and a fair trial.

Although the defendant did not object to the purported improprieties he now challenges on appeal, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 541–42, 180 A.3d 882 (2018).

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a

heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Reddick*, 174 Conn. App. 536, 559, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied,      U.S.     , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018).

With the foregoing in mind, I address each of the defendant's claims of prosecutorial impropriety in turn to determine whether any improprieties occurred.

A

The defendant first claims that the prosecutor improperly denigrated defense counsel during his closing argument. Specifically, he claims that the prosecutor's remarks improperly implied that defense counsel was employing standard tactics used in all trials. The state counters that the prosecutor's comments were proper because they challenged the theory of the defense.

"It has been held improper for the prosecutor to impugn the role of defense counsel. . . . In particular, [i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . .

"Closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. . . . [S]ome leeway must be afforded to the advocates in offering arguments to the jury in final argument. . . . [C]ounsel must be allowed a generous latitude in argument . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 180, 133 A.3d 921 (2016).

In *Fasanelli*, the defendant argued "that the prosecutor improperly denigrated defense counsel by implying that defense counsel was being deceitful and using standard defense tactics" during his closing argument Id., 181. This court concluded, however, that the challenged comments, when read in context, "did not attack

defense counsel; rather, each of the challenged comments attacked the theory of the defendant . . . ." Id., 182. Because the prosecutor's comments were based on evidence in the record and attacked only the theory of the defense, the court concluded that they were proper. Id.

In the present case, the prosecutor stated the following during his initial closing argument: "Now, [defense counsel's] going to get up here, I assume, [and say] that the Hartford police are lying, [Detective] Reggie Early lied, you know, that was a deceitful tactic that he used, you know, that's—if he lies that way, why should you believe any of his testimony? Whatever. Completely predictable. When your back [is] up against the wall, that's what the defense is going to be. Always blame the police, all right."

Similarly to *Fasanelli*, when read in context these comments are clearly based on evidence in the record and attack the apparent theory of the defense, as shown during defense counsel's cross-examination. The prosecutor's comments were directed to defense counsel's attempts during trial to attack the credibility of the Hartford police, particularly, Detective Early's testimony regarding the manner in which he secured the defendant's confession. The defendant's apparent theory was that, because Early had secured the defendant's confession by using a fabricated confession from Harris, he must not have been truthful in the remainder of his testimony. In light of this defense theory, the prosecutor's comments in attacking it were not improper.

B

The defendant next claims that the prosecutor improperly made substantive use of Harris' tape-recorded phone conversation with his mother that was recorded by the Department of Correction in accordance with its usual policy. Some of Harris' statements were admitted by the court as prior inconsistent statements to impeach his trial testimony. Subsequently, during the prosecutor's initial closing argument, the prosecutor referenced the tape-recorded conversation, which had not been admitted as a full exhibit for all purposes, and then repeated to the jury what Harris had said to his mother during the phone call for the truth of the statements. In particular, the prosecutor stated:

"One point in [Harris'] testimony that he's talking to his mom: First, I think I am being charged with everything [the defendant] is. Cop told me the warrant is for not cooperating, and I'm like, yeah, I'll take that. Makes sense. If you woulda seen the video they showed me, *I coulda got charged with the same thing* [*the defendant*] *got charged with*. They showed me the video. . . . They showed everything. *When I sat down, when I couldn't move, they showed* [*the defendant*] *walked*

*up to me.* Then they showed him run off. Then they show this girl run out, tie my leg up. They showed the whole thing. . . .

"He testified that [he and the defendant were] arrested at the same time, that they were at [the] Hartford lockup at the police department, and they were placed in cells next to each other. They smacked [the defendant] with the charges right there. They had us together. *They really put us together and this 'n' shot me. . . .* And then [Harris] laughs. I'm in a holding cell. I don't know how [the defendant] seen me. I'm asleep. [The defendant] seen me. They put [the defendant] in a cell like two cells down. It's like, one, two in the morning. All I hear is: George. George. Come on, man. I know you hear me. I know you hear me. I just seen you. I just seen you. I'm like, this 'n' really trying to talk to me? *I'm in jail 'cause of him right now 'cause he shot me in the leg.*

"*That's testimony, ladies and gentlemen.* That's not given to police or the state's attorney's office." (Emphasis added.)

Our Supreme Court has adopted a rule "allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross examination." *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). In *Whelan*, the court also held that "[p]*rior oral statements of a witness, easily manufactured and often difficult to rebut, should not be used to prove an element of a crime essential to guilt.*" (Emphasis added.) Id., 754. In the years following *Whelan*, our Supreme Court has recognized that "the general rationale of *Whelan* concerning written statements also applies to tape-recorded statements . . . [and that] the requirement that such statements be signed is unnecessary because the recording of the witness' voice imparts the same measure of reliability as a signature." (Citation omitted.) *State* v. *Woodson*, 227 Conn. 1, 21, 629 A.2d 386 (1993). Additionally, this court has stated that a witness' identification of his or her own voice on tape is afforded "the same measure of reliability as a signature." (Internal quotation marks omitted.) *State* v. *Perry*, 48 Conn. App. 193, 199–200, 709 A.2d 564, cert. denied, 244 Conn. 931, 711 A.2d 729 (1998); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.27.3 (b), p. 606. The *Whelan* rule and its subsequent developments and clarifications have been incorporated into § 8-5 (1) of the Connecticut Code of Evidence, which states that prior inconsistent statements are not excluded by the hearsay rule, "provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that

of the witness, and (C) the witness has personal knowledge of the contents of the statement." See also Conn. Code Evid. § 8-5 (1), commentary.

In *Woodson*, the state had played a tape recording of a witness' statement to police to show its inconsistency with the witness' in-court testimony, in which he had disavowed any knowledge of the tape-recorded statements. See *State* v. *Woodson*, supra, 227 Conn. 19. Subsequently, the trial court admitted the taped statement into evidence and had portions of it played for the jury. Id. Our Supreme Court ultimately concluded that the trial court properly admitted the prior inconsistent statement for substantive purposes. Id., 23. In the present case, although the state similarly played the tape-recorded statement made by Harris to his mother to show its inconsistency with his in-court testimony that he did not remember who shot him, the state did not attempt to admit the tape recording into evidence as a full exhibit. Rather, the state made clear that the tape-recording was not being offered for its truth, but only to show its inconsistency with Harris' testimony. Moreover, the court made clear in its instructions to the jury, after the tape recording was played, that the jurors should consider it only as it related to his credibility and that it was not substantive evidence.

As such, the prosecutor's two references in closing argument to Harris' statements in the tape recording for their truth were improper because the statements had not been previously admitted as substantive evidence. The prosecutor, therefore, improperly utilized Harris' recorded statements in his closing argument.

C

The defendant next claims that the prosecutor improperly expressed his opinion about the credibility of two of the state's witnesses, Harris and Joaquin Cedeno, both of whom were victims of the shooting.

"[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. . . . [W]e must look at the statement, including the use of the pronoun I, as a whole, in determining whether it was an expression of the state's attorney's personal opinion regarding the credibility of

witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, supra, 163 Conn. App. 185–86.

During his initial closing argument, the prosecutor made the following comments: "You can listen back to George Harris' testimony. It was painful. He would listen to part of the tape. Is that you? Yes it is. And did you say that? And right after listening to the tape, he would say no, okay. He was an obstructionist." In addition, during his initial closing argument, the prosecutor stated: "But again, the problem is, [the police] are dealing with obstructionists like Joaquin Cedeno and George Harris. Complete obstructionists." During his rebuttal closing argument, the prosecutor stated: "I have to comment on Mr. Cedeno and Mr. Harris. The only thing that they're up here for, what I put them on for—because they are obstructionists—just to let you know that they got shot." Finally, during rebuttal the prosecutor stated: "If Harris and Cedeno want to be obstructionists to our criminal justice system, let it be. So be it."

The prosecutor's comments were not improper. The comments were based on Harris' and Cedeno's testimony adduced at trial and reflect an effort on the part of the prosecutor to invite the jury to draw the reasonable inference that their testimony regarding the incident lacked credibility. See *State* v. *Richard W.*, 115 Conn. App. 124, 135–36, 971 A.2d 810 ("[i]t is without question that a prosecutor may fairly comment on evidence and the reasonable inferences to be drawn therefrom that lead the jury to a conclusion as to the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 293 Conn. 917, 979 A.2d 493 (2009). Specifically, because the prosecutor had established during the trial that Harris and Cedeno were friends and that the defendant and Harris were friends, the jury could have drawn a reasonable inference from Harris' impeachment by his prior inconsistent statements to his mother that he was lying to obstruct the prosecution of the defendant and to protect himself, Cedeno, and the defendant. The prosecutor's comments that Harris and Cedeno were obstructionists, therefore, were not based solely on the prosecutor's personal opinion, but on the plausible motives that they may have had to protect themselves and the defendant. See *State* v. *Stevenson*, 269 Conn. 563, 584–85, 849 A.2d 626 (2004); id., 585 ("[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie" [internal quotation marks omitted]); see also *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003) (same). The prosecutor, therefore, did not improperly express his personal opinion regarding the credibility of Harris and Cedeno.

D

The defendant next claims that the prosecutor improperly (1) appealed to the jurors' emotions and (2)

injected extraneous matters into the trial.

"It is well established that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . [I]n deciding cases [however] . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks." (Citation omitted; internal quotation marks omitted.) *State* v. *Barry A.*, 145 Conn. App. 582, 601–602, 76 A.3d 211, cert. denied, 310 Conn. 936, 79 A.3d 889 (2013). "An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or [his or] her family." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 34, 66 A.3d 520 (2013).

In addition, "[a] prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [T]he privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Citation omitted; internal quotation marks omitted.) *State* v. *Barry A.*, supra, 145 Conn. App. 605.

In the present case, the defendant takes issue with the following statements made by the prosecutor during his rebuttal closing argument:

"If Harris and Cedeno want to be obstructionists to our criminal justice system, let it be. So be it. But the state is not going to sit back and let people like Cedeno and Harris dictate that if they don't want to come into the court, we're not going to prosecute. They don't decide the criminal justice system, okay. We're not going to sit back just because I don't care and I'm not saying who did it. The state's not going to sit back and say, okay, that's fine, move on. The state's going to press on by other means.

"Does the state have an interest in the case? You bet we do. Two people were critically injured, shot by this defendant who illegally possessed a firearm, who intentionally and with extreme indifference to human life fired it in a residential neighborhood. A community, regardless of a person's ethnic or economic background, has a right, a privilege, to not be subjected to

this violent, criminal conduct."

The defendant argues that the statements improperly urged the jurors to find him guilty to ensure that Harris and Cedeno would not get away with manipulating the criminal justice system through their "deliberate obstructionism," and to protect the ethnically diverse and economically disadvantaged community in which they lived. As previously set forth in part I C of this concurring opinion, the prosecutor's comments referring to Harris and Cedeno as obstructionists were not improper because they were appropriately based on evidence adduced during trial. Moreover, the prosecutor's comments referencing the community were not directed at urging the jury to find the defendant guilty because of the location of the incident, but rather, urged the jury to remember that all communities have a general right to be free from the violence that occurred in this case. The prosecutor did not state that there was a greater reason to convict the defendant because of the particular location of the incident, nor did he urge the jury to have sympathy for the victims because of who they were or where they were from. Compare *State* v. *Payne*, 260 Conn. 446, 463, 797 A.2d 1088 (2002) (finding prosecutor's statement improper where he indicated that only guilty verdict would protect legal system), and *State* v. *Santiago*, supra, 143 Conn. App. 41–42 (prosecutor improperly appealed to emotions of jurors where he urged them to decide case on basis of sympathy for victim and victim's family), with *State* v. *Long*, 293 Conn. 31, 60, 975 A.2d 660 (2009) (prosecutor's remark not improper where it neither disparaged defendant nor painted victim as particularly vulnerable or deserving of sympathy, but instead was based on evidence presented at trial). The prosecutor's statements, therefore, neither appealed to the jurors' emotions nor injected extraneous matters into the trial.

E

Because the prosecutor committed an impropriety by making substantive use of Harris' prior oral inconsistent statements during his closing argument, the question of whether that established impropriety "so infected the trial with unfairness as to make the resulting conviction a denial of due process" must be examined. (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987).

"In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's

case." (Citations omitted.) Id., 540. "[T]he burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, supra, 303 Conn. 563.

As to whether the prosecutor's improper references to Harris' prior inconsistent statements were invited by defense counsel, the record reflects that the references were made during the prosecution's initial closing argument and not in response to statements that defense counsel made in his closing argument. Thus, these comments could not have been invited by the defendant. See *State* v. *Ceballos*, 266 Conn. 364, 409–10, 832 A.2d 14 (2003) ("[T]he state's attorney's improper comments during summation, were not invited by the arguments of defense counsel. . . . As the defendant correctly points out, the state's attorney made the challenged . . . comments during his initial summation, and *not* during the state's rebuttal to the defendant's closing argument." [Citation omitted; emphasis in original.]). As such, this factor favors the defendant.

Additionally, the factor regarding the centrality of the impropriety to the critical issues in the case also favors the defendant. The prosecutor's assertion during his closing argument that Harris' prior inconsistent statement placed the defendant at the scene of the shooting went to the defendant's identification as the shooter, which was a crucial issue in this case.

With respect to the frequency of the impropriety, the prosecutor's substantive references to Harris' prior inconsistent statements were not frequent. The prosecutor's references regarding the identification of the defendant in Harris' prior inconsistent statements occurred only during the prosecutor's initial summation. See *State* v. *Ross*, 151 Conn. App. 687, 701, 95 A.3d 1208 ("the claimed improprieties were not pervasive throughout the trial, but were confined to, and constituted only a small portion of, closing and rebuttal argument, a part of the trial where we typically allow some latitude" [internal quotation marks omitted]), cert. denied, 314 Conn. 926, 101 A.3d 271, 272 (2014). Accordingly, the frequency factor favors the state.

As to the sufficiency of curative measures taken by the court, the court provided jury instructions indicating that the prosecutor was not permitted to give an opinion as to the defendant's guilt, that it was the role of the jury to find the facts, and that witness credibility was an issue solely for the jury. Additionally, the court instructed the jury during Harris' direct examination that it "should consider that out-of-court evidence only as it relates to [the witness'] credibility" and that "[i]t's not substantive evidence." The court later repeated these instructions, directing the jury that it "should consider this evidence only as it relates to the credibility

of the witness' testimony, not as substantive evidence." Furthermore, there is no suggestion in the present case that the jury failed to follow the court's instructions. "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 485.

The defendant argues that the court's "general instructions were not sufficient to cure the prejudicial impact of the improper arguments." Even if the court's instructions were found to be insufficient, however, "the defendant, by failing to bring [specific curative instructions] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 483. As such, the defendant's failure to object to the prosecutor's reference to Harris' prior inconsistent statement creates a presumption that the defendant did not view the impropriety as prejudicial enough to affect his right to a fair trial. See id., 479–80 ("[W]e consider it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . Given the defendant's failure to object, *only instances of grossly egregious misconduct* will be severe enough to mandate reversal." [Citation omitted; emphasis added; internal quotation marks omitted.]).

Although the defendant concedes that he failed to object to the prosecutor's allegedly improper statements when or after they were made, he argues that the resulting impropriety was so severe as to deprive him of a fair trial. Because the prosecutor's substantive references to Harris' prior inconsistent statements were not frequent, and the defendant failed to object to them, the prosecutor's substantive references to Harris' prior inconsistent statements were not grossly egregious enough to warrant reversal. See id., 480 ("[g]iven the defendant's failure to object, only instances of grossly egregious misconduct will be severe enough to mandate reversal"); see also *State* v. *Ross*, supra, 151 Conn. App. 700 (defendant not entitled to prevail if "the claimed [impropriety] *was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial*" [emphasis added; internal quotation marks omitted]).

As to the strength of the state's case, the prosecutor conceded in his argument to the jury that the video of the shooting, which was shown to the jury and had been obtained from nearby security cameras, was not enough for the jury to return a verdict of guilty, but

pointed to other ways the state could corroborate the defendant's identification, such as "clothes, Officer [Robert] Fogg [of the Hartford Police Department], the timing coincidence, George Harris, the video and the reasonable inferences you can draw from it, and Detective Reggie Early." Specifically, the record reveals that Officer Fogg's testimony placed the defendant at the scene ten minutes after the shooting, and the video footage showed the figure who committed the shooting in clothes similar to what the defendant was wearing when he arrived on the scene. Furthermore, the prosecutor had properly impeached Harris' credibility by presenting his prior inconsistent statements through the tape-recorded phone conversation he had engaged in with his mother. Thus, the jury reasonably could have inferred that Harris was untruthful when he responded to the question about whether the defendant was at the scene of the shooting when it occurred, but, of course, the jury could not have concluded solely from those prior inconsistent statements that the facts supporting them were true. Additionally, the defendant admitted, albeit as a result of the confession allegedly made by Harris that had been fabricated by and read to the defendant by Early, that he was the shooter. See *State* v. *Camacho*, 282 Conn. 328, 383, 924 A.2d 99 (state's case strong where, among other evidence, defendant admitted he had shot woman), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). As such, this factor favors the state.

Because the *Williams* factors primarily favor the state, the defendant has failed to prove that the prosecutor's improper substantive use of Harris' prior inconsistent statement violated his rights to due process and a fair trial.

II

*BRADY* VIOLATION

The defendant next claims that the state withheld material evidence regarding Early's credibility in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the defendant claims that the state deprived him of the right to cross-examine Early in regard to a Hartford Police Department internal affairs report detailing his misconduct, which was totally unrelated to the criminal incident involving the defendant and Harris, stemming from an encounter with a towing company. The state argues that the report was neither favorable nor material because it was not probative of Early's untruthfulness, and it was not reasonably probable that use of the report would have changed the result of this case.

The following additional facts are relevant to the disposition of this claim. The defendant alleges that, subsequent to the parties' filing of their initial briefs, he became aware of an internal affairs report involving

Early through a January 24, 2017 article published by the Journal Inquirer newspaper. The report detailed a 2007 investigation conducted by the Hartford Police Department to determine whether Early had abused his position as a police officer in attempting to convince a towing company to release his car without charging him a fee, and whether he intentionally misled the investigation by giving a false statement as to who drove him to the towing company. The report stated that an internal affairs sergeant sustained the charge of abuse of police powers as well as the allegation that Early intentionally made a false statement to investigators. The report further stated that Early was issued a written reprimand for abusing his position as a police officer but was not disciplined for making the false statements, as they did not appear aimed at misleading the investigation.

On February 10, 2017, after discovering the report, the defendant filed a motion for permission to file a late motion for augmentation and rectification of the record with this court in order to establish a *Brady* claim. Specifically, the defendant sought an evidentiary hearing to determine whether the state had failed to disclose an internal affairs investigation relating to Early at the time of trial and requested that the trial court mark the report as an exhibit. On February 27, 2017, the state filed a response to the defendant's motion, conceding the facts on which the defendant relied to establish his *Brady* claim and not opposing rectification of the record. The state further conceded that the report had been in the possession of the Hartford Police Department but had not been disclosed by the state prior to or during trial. Accordingly, the state argued that because suppression of the report was not a contested factual issue, an evidentiary hearing was not necessary. On March 15, 2017, this court granted the defendant's motion for permission and ordered the defendant to formally file his motion. On March 21, 2017, the defendant filed a revised motion for augmentation and rectification of the record with the trial court, in which he agreed with the state that an evidentiary hearing was not necessary due to the state's concessions. On November 6, 2017, the court granted the defendant's motion and marked the report as an exhibit.

"It is the duty of the state voluntarily to disclose material in its exclusive possession which would be exonerative or helpful to the defense . . . . The prosecution's duty to disclose applies to all material and exculpatory evidence that is within its possession or available to it . . . and that the prosecution knew or should have known was exculpatory. . . . To prove a *Brady* violation, therefore, the [defendant] must establish: (1) that the state suppressed evidence (2) that was favorable to the defense and (3) material either to guilt or to punishment. . . . If the [defendant] fails to meet his burden as to one of the three prongs of the *Brady*

test, then we must conclude that a *Brady* violation has not occurred." (Citations omitted; internal quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 687–88, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017). Moreover, "[w]hether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) Id., 689.

In the present case, the state has conceded that the internal affairs report was "suppressed within the meaning of *Brady* and its progeny." (Internal quotation marks omitted.) As such, the inquiry becomes whether the report was favorable to the defendant and material to his guilt or his punishment. "The United States Supreme Court . . . has recognized that [t]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Citations omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d 512 (2013).

The defendant argues that the false statements that Early made to investigators detailed in the report are specific acts of misconduct that were essential to the defense in order to impeach his credibility. The state argues that because the Hartford Police Department ultimately did not uphold the finding made by the investigating internal affairs sergeant that Early had intentionally made false statements, an inference of untruthfulness stemming from the statements "was at best very low."

Section 6-6 (b) (1) of the Connecticut Code of Evidence provides that "[a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness." Moreover, "[t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 153, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011). In the present case, the fact that Early was accused of intentionally lying and was initially found to have done so by the investigating internal affairs sergeant was impeachment evidence that was favorable to the defense. It would have been within the jury's province to

assess Early's credibility on the basis of the accusations contained within the report. This court's acceptance of the state's argument would be tantamount to preventing a jury from conducting this assessment. Because the internal affairs report would likely bear on the credibility of Early, it was potential impeachment evidence and, therefore, favorable to the defendant's position.

Although the internal affairs report was suppressed within the meaning of *Brady* and was favorable to the defense, it was not material under *Brady*. "Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . *United States* v. *Bagley*, [473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)]. In a classic *Brady* case, involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. *Bagley*'s touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 370–71.

In the present case, the defendant argues that the internal affairs report was material because Early's testimony was the state's most compelling evidence and, therefore, the defendant's ability to cross-examine Early with his own statements impacted the fairness of the trial. The state argues that the report was not material because it had little probative value for purposes of casting doubt on Early's investigation and the defendant's confession, the defendant had impeached Early by other means, including his fabrication of the purported Harris confession, and the state's evidence was strong.

The state's failure to disclose the report to allow the defendant yet another opportunity to impeach Early's credibility, viewed in the context of the entire trial,

does not undermine confidence in the jury's verdict. As previously discussed in part I E of this concurring opinion, there was sufficient evidence in the record to support the defendant's conviction, namely, Officer Fogg's testimony that placed the defendant at the scene ten minutes after the shooting; video footage that showed the shooter in clothes similar to what the defendant was wearing when he arrived on the scene; Harris' prior inconsistent statements allowing the jury to infer his lack of credibility; and the defendant's confession that he was the shooter. See *Elsey* v. *Commissioner of Correction*, supra, 126 Conn. App. 160 ("[T]here was ample evidence to support the petitioner's conviction. . . . Therefore, we cannot say that the fact that the state did not disclose the evidence . . . undermines our confidence in the jury's verdict." [Citation omitted.]). As previously set forth, Early's credibility had been impeached during his cross-examination when the defense questioned him regarding his admitted fabrication of Harris' purported confession, which, in turn, led to the defendant's confession. See *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 299, 979 A.2d 507 ("[t]his evidence . . . taken in context is merely cumulative impeachment evidence and, therefore, not material under *Brady*"), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

Because the state's evidence was sufficient for the jury to find the defendant guilty, and because the evidence contained in the report was at best cumulative concerning Early's credibility, the internal affairs report was not material within the meaning of *Brady*. Accordingly, the defendant's *Brady* claim fails.

III

PLAIN ERROR

The defendant next claims that the state's agreement with Harris not to prosecute Harris for any future acts of perjury committed while testifying for the state at the defendant's trial constituted plain error because (1) it clearly violated the public policy of this state against immunizing perjured testimony and (2) it violated § 54-47a.[3] The defendant further argues that this improper grant of immunity constitutes structural error that obviates the need to engage in harmless error analysis. In the alternative, the defendant argues that, if harmless error analysis applies, the state has failed to meet its burden to show that the error was harmless beyond a reasonable doubt. The state concedes that its agreement not to prosecute Harris for perjury was a defective and improper grant of immunity, but argues that such error was not structural in nature, nor did it cause the defendant manifest injustice.

The state concedes that its promise not to prosecute Harris for perjury in connection with his upcoming testimony was a defective and improper grant of immunity

that was inconsistent with Harris' duty to testify truthfully. The state articulates that plain error analysis requires a court not only to examine the nature of the error, but also to assess the grievousness of its consequences and whether it worked a serious and manifest injustice on the defendant. The state argues that the defendant was not harmed by the grant of immunity to Harris because Harris did not state during his testimony that the defendant had shot him or Cedeno. The state refers to the court's instructions to the jury that Harris' out-of-court statements, including those in which he said that the defendant shot him, could not be used substantively, but only on the issue of the credibility of his in-court testimony. The state also argues that there was other evidence to prove the defendant's guilt, and that the jury reasonably could have found, on the basis of evidence developed through a witness other than Harris, and through the state's impeachment of Harris, that Harris was lying when he testified that he did not know who shot him, and that everyone, including the jury, should have seen that. From those facts the state concludes that "the prosecutor's error did not inflict grievous harm causing manifest injustice upon the defendant . . . ." Although the state refers to Harris' immunized testimony before the jury that was permitted by the court, the state does not discuss the court's role and duty with respect to the truth seeking process that is inherent in any trial, and the constitutional, statutory, public policy and other institutional implications and ramifications of a representative of the state offering the testimony of a witness, and the court's permitting that testimony to be presented to the jury, which both was anticipated and expected to contain lies about a crucial issue in the trial, i.e., whether the defendant shot Harris and Cedeno. The state also does not discuss the contradiction between the grant of immunity that was not disclosed to the jury and the usual oath to tell the truth, which Harris took before the jury: "You solemnly swear or solemnly and sincerely affirm, as the case may be, that the evidence you shall give concerning this case shall be the truth, the whole truth and nothing but the truth; so help you God or upon penalty of perjury." General Statutes § 1-25.

The following additional facts are relevant to this claim. On October 9, 2014, the prosecutor and Harris entered into an immunity agreement by which Harris was granted transactional immunity for his testimony regarding the events on March 28, 2013, the date of the shooting, and use immunity, both direct and derivative, for all other proceedings. That same day, October 9, 2014, prior to Harris' testimony in the defendant's trial, the following exchange occurred between the court, Harris' counsel, and the prosecutor:

"[The Court]: All right. And this additional immunity agreement signed by the state's attorney . . . do you

have any issues on that?

"[Harris' Counsel]: No. That was drafted—I was involved in the drafting of that document, Your Honor.

"[The Court]: All right.

"[Harris' Counsel]: And so it includes transactional immunity to the events related to the—on the day of the shooting, directly and indirectly. It involves use immunity, so none of his words could be used directly against him in this or any other proceeding in state or federal court or anywhere else. It also includes derivative use so that his words can't be used to investigate and then come up with other evidence that can be used against him in any proceeding. . . .

"[Harris' Counsel]: And my understanding is that there is a tape recording or the prosecuting authority believes that it has a tape recording of my client saying something related to his testimony. So, I have concerns about exposure to perjury, and my understanding is that there has been an agreement that there wouldn't be any perjury prosecution related to my client's testimony today.

"[The Prosecutor]: That's correct, Your Honor.

"[The Court]: Okay. Well, [counsel], I must compliment you. I have been in the criminal justice system for forty-two and one-half years. I've never heard of anybody getting that agreement. But it's an agreement the state made. That's their decision."

During Harris' direct testimony, when the state offered Harris' tape-recorded phone conversation with his mother as a prior inconsistent statement, the following exchange occurred:

"[The Prosecutor]: Well, this is the way you could refresh his memory, Your Honor.

"[The Court]: Well, you're the one who agreed not to prosecute him for perjury.

"[The Prosecutor]: I agree.

"[The Court]: Which is probably against the public interest, but I didn't step in.

"[The Prosecutor]: There's a lot of issues with public interest in this case.

"[The Court]: I must say this amount of perjury actually offends me."

"[The plain error] doctrine, codified at Practice Book § 60-5,[4] is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party." (Footnote added; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–77, 60 A.3d 271

(2013).

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [Previously], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . Put another way, plain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal."[5] (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812–14, 155 A.3d 209 (2017).

In the present case, the defendant argues that the violation of § 54-47a (b) and the public policy against immunizing perjured testimony constitutes plain error that is structural in nature. The United States Supreme Court has recently articulated that "[t]he purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of structural error is that it affect[s] the framework within which the trial proceeds, rather than being simply an error in the trial process itself. . . . For the same reason, a structural error def[ies] analysis by harmless error standards." (Citation omitted; internal quotation marks omitted.) *Weaver* v. *Massachusetts*, U.S. , 137 S. Ct. 1899, 1907–1908, 198

L. Ed. 2d 420 (2017).[6] As such, a trial is affected by structural error when "the error always results in fundamental unfairness." (Internal quotation marks omitted.) *State* v. *Cushard*, 328 Conn. 558, 570, 181 A.3d 74 (2018).

Although structural error most commonly occurs in the violation of a constitutional right; see *Weaver* v. *Massachusetts*, supra, 137 S. Ct. 1908 ("violation of the right to a public trial is a structural error"); see also *State* v. *Lopez*, 271 Conn. 724, 733–34, 859 A.2d 898 (2004) (violation of constitutional right to be present during in-chambers inquiry regarding defense counsel's potential conflict of interest was structural error); our Supreme Court has also found structural error in the form of a statutory violation. See *State* v. *Murray*, 254 Conn. 472, 496–98, 757 A.2d 578 (2000) (substitution during jury deliberations of alternate juror who previously had been dismissed violated General Statutes § 54-82h [c]). In *Murray*, our Supreme Court overruled in part its previous decision in *State* v. *Williams*, 231 Conn. 235, 645 A.2d 999 (1994), which had determined that violation of § 54-82 (c) was subject to harmless error analysis and concluded "that the inclusion of a nonjuror among the ultimate arbiters of innocence or guilt [in violation of § 54-82h (c)] necessarily amount[ed] to *a* [*defect*] *in the structure of the trial mechanism that defie*[*d*] *harmless error review.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Murray*, supra, 498. Accordingly, the court endorsed the position that certain statutory violations that pervade the entirety of the trial may be subject to structural error analysis. "These so-called structural errors tend to by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." (Internal quotation marks omitted.) *State* v. *Cushard*, supra, 328 Conn. 570.

Because structural error may occur in the form of a statutory violation, structural error analysis is warranted in the present case. "[T]o determine if the error in the present case was structural, we must perform an initial review of the record to determine whether the [violation] had any impact on the subsequent trial that *irretrievably eroded its fundamental fairness.*" (Emphasis added.) Id., 578. Under both § 54-47a (b)[7] and our Supreme Court case law, immunity for perjured or false testimony in a criminal trial is improper. See *State* v. *Giraud*, 258 Conn. 631, 634–35, 783 A.2d 1019 (2001) ("[i]mmunity . . . may not be a license to lie while giving immunized testimony" [internal quotation marks omitted]). As previously set forth, the state concedes that its agreement not to prosecute Harris for his perjured testimony at the defendant's trial was an improper and defective grant of immunity. Indeed, the record reflects that both the very experienced trial court judge and the prosecutor recognized that the breadth of the immunity agreement was improper, and probably

unique, in Connecticut criminal proceedings. As such, the issue is whether this improper grant of immunity was so fundamentally unfair that it affected the entire framework of the defendant's trial.

It is axiomatic that "a primary function of a criminal trial is to search for the truth. . . . The trial court has a duty to preside at a trial and to take appropriate actions, when necessary, that promote truth at the trial." (Citation omitted.) *State* v. *Kirker*, 47 Conn. App. 612, 617, 707 A.2d 303, cert. denied, 244 Conn. 914, 713 A.2d 831 (1998). "Although . . . an important function of a trial is a search for facts and truth . . . a trial must also be fair. *State* v. *Corchado*, 200 Conn. 453, 459, 512 A.2d 183 (1986) (discretion to be exercised must be informed and guided by considerations of fundamental fairness that are ingrained in the concept of due process of law)." (Internal quotation marks omitted.) *State* v. *Allen*, 205 Conn. 370, 379, 533 A.2d 559 (1987). Moreover, a jury is "entitled to assume . . . that [a witness'] statements carried the sanction of the oath which [the witness] had taken . . . ." *Ruocco* v. *Logiocco*, 104 Conn. 585, 591, 134 A. 73 (1926). Additionally, the trial court's unwaivable duty to prohibit knowingly perjured testimony by a witness in a trial, and the jury's entitlement to assume that each witness is providing testimony under the penalty of perjury, are embodied in the language of § 54-47a (b), which explicitly forbids the immunization of perjured testimony.

In the present case, the court knowingly abdicated its duty to reject any agreement that facilitated Harris' perjured testimony, and it undermined the truth seeking purpose of the defendant's trial by permitting Harris to testify without fear of prosecution for perjury.[8] The defendant's attorney did not make any objection on the record to the immunity agreement between the state and Harris. The court, however, appears immediately to have accepted the agreement without asking the defendant to comment on its validity. The court, as it expressed on the record, was fully aware of the impropriety of, and other problematic issues raised by the agreement, and it was also aware of and commented on Harris' obviously perjurious testimony after at least some of it had occurred. In light of the clear statutory invalidity of the agreement, and the other obvious issues that were raised by the agreement, the court had a clear and unwaivable duty to act to prohibit Harris' testimony, even in the absence of any objection by the defendant to it, and its failure to do so was plain error.

Additionally, it is reasonable to conclude, on the basis of the record of the trial, that the state provided Harris with immunity from perjury in order to use his testimony as a basis to put Harris' prior inconsistent statements in front of the jury, initially to impeach his credibility. The state, however, subsequently and in violation of its representation to the court that it offered

the evidence solely for the purpose of impeachment and not for the truth of the statements therein, improperly utilized those statements for their truth in its closing argument. The court's abdication of its duty to take appropriate actions, when necessary, that promoted truth finding at the trial by allowing the immunization of Harris' testimony so that he could not be charged with and convicted of perjury undermined the fundamental fairness of the defendant's trial.

If the court, as it should have done pursuant to § 54-47a (b) and Connecticut public policy, had rejected the agreement for Harris' testimony, there presumably would have been no testimony by Harris before the jury about the incident because Harris would have exercised his fifth amendment privilege against self-incrimination, and there would have been no structural error despite the existence of the agreement. Although plain error in this case exists solely because of the court's acceptance and implementation of the agreement, which allowed the improper, overbroad, and seemingly unprecedented immunization of Harris' testimony that the state anticipated would include perjury; see footnote 2 of this concurring opinion; the collateral consequences of that testimony enhance the egregiousness of the improper grant of immunity. Had the state not provided Harris with immunity for his intentional lies that it anticipated were to occur during his testimony, Harris would not have testified and, thus, the state would not have improperly been able to utilize in its closing argument Harris' prior inconsistent statements against the defendant in a way that substantively corroborated the statements made by the defendant in his confession.

The court's acceptance and implementation of the agreement, which allowed the improper, overbroad immunization of Harris' testimony that was anticipated to include lies that amounted to perjury thus constituted plain error that was structural in nature. As previously set forth, the plain error doctrine is reserved for truly extraordinary situations in which the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. See *State* v. *McClain*, supra, 324 Conn. 812–14. Giving a witness a free pass to lie in his sworn testimony satisfies that plain error requirement. The defendant has demonstrated that the actions of the court and the prosecutor resulted in manifest injustice to him; perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings, as it goes to the very heart of the fair administration of justice. *United States* v. *Mandujano*, 425 U.S. 564, 576–77, 96 S. Ct. 1768, 48 L. Ed. 2d 212 (1976). Accordingly, I concur with the majority's reversal of the defendant's conviction and remand of the case for a new trial, but, because of the existence of such structural error, conclude that we do not need to exercise our supervisory authority to do so.[9]

[1] On December 14, 2017, prior to oral argument before this court, the defendant filed a motion requesting supplemental briefing as to his claim pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which this court granted on January 11, 2018. On May 31, 2018, after oral argument, this court ordered, sua sponte, that the parties file supplemental briefs addressing whether the state's agreement not to prosecute Harris for any perjury committed while testifying for the state constituted plain error. On October 5, 2018, this court again ordered, sua sponte, supplemental briefing to address whether this court should exercise its supervisory authority to reverse the defendant's conviction if the grant of immunity to Harris for any perjury while testifying for the state was improper.

[2] The defendant focuses on the actions of the prosecutor in entering into the agreement with Harris that violated the public policy of Connecticut and General Statutes § 54-47a. Without the acceptance and implementation of that agreement by the court in allowing Harris to testify, the agreement would have had no effect. I thus interpret the claims of the defendant to include the actions of the court in allowing Harris to testify pursuant to the illegal and improper agreement.

[3] In its August 15, 2018 supplemental brief, the defendant argued that "[t]he agreement to immunize Harris from prosecution for any perjury he might commit in testifying was plain error, both because it violated public policy, and because it violated [§] 54-47a. It is well established that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair. *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 371–73; *United States* v. *Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). . . . By expressly prohibiting grants of immunity for the crime of perjury; [General Statutes] § 54-47a; the legislature safeguarded the fundamental rights to a fair trial and to confrontation. U.S. Const., amends. V, VI and XIV; Conn. Const., art. I, § 8. . . . Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings; *United States* v. *Mandujano*, 425 U.S. 564, 576–77, 96 S. Ct. 1768, 48 L. Ed. 2d 212 (1976); it goes to the very heart of the fair administration of justice. No legal system can long remain viable if lying under oath is treated as no more than a breach of etiquette. *United States* v. *Cornielle*, 171 F.3d 748, 753 (2d Cir. 1999). . . . In the constitutional process of granting immunity to secure witness testimony, perjury simply has no place whatever. *United States* v. *Mandujano*, supra, 576–77." (Citations omitted; internal quotation marks omitted.)

Although the primary focus of the defendant's argument is the agreement, it is evident from the defendant's August 15, 2018 supplemental brief that the structural harm alleged to be caused to the defendant occurred after the court allowed Harris to testify at trial with such an illegal and improper grant of immunity that was not disclosed to the jury, which had witnessed Harris take the usual oath to tell the truth: "You solemnly swear or solemnly and sincerely affirm, as the case may be, that the evidence you shall give concerning this case shall be the truth, the whole truth and nothing but the truth; so help you God or upon penalty of perjury." See General Statutes § 1-25.

[4] Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

[5] The court in *State* v. *McClain*, 324 Conn. 802, 155 A.3d 209 (2017), recently discussed the plain error doctrine, citing numerous examples of its application by our Supreme Court and this court. See *State* v. *Ruocco*, 322 Conn. 796, 803, 144 A.3d 354 (2016) "(failure to give statutorily mandated instruction is plain error); see also, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 645–46, 95 A.3d 1011 (2014) (plain error for Appellate Court to affirm judgment of trial court granting motion to strike on alternative ground rather than remanding to afford party opportunity to amend pleading); *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 522–25, 911 A.2d 712 (2006) (failure of trial judge to remove himself from presiding over defendant's habeas petition plain error when judge had represented defendant at his guilty plea); *Belcher* v. *State*, 99 Conn. App. 353, 354–58, 913 A.2d 1117 (2007) (judge's failure to disqualify himself based on his appearance as counsel on brief filed on behalf of defendant on direct appeal was plain error); *State* v. *Cotton*, 69 Conn. App. 505, 506, 794 A.2d 1116 (2002) (complete failure to instruct jury as to meaning of term 'drug dependency' is plain error); *State* v. *Hair*, 68 Conn. App. 695, 706, 792 A.2d 179 (plain error for court to instruct jury on offense with which defendant was not charged and then

accept jury's guilty verdict for offense on which jury had not been instructed), cert. denied, 260 Conn. 925, 797 A.2d 522 (2002); *State* v. *Thornton*, 55 Conn. App. 28, 33–34, 739 A.2d 271 (1999) (plain error to require defendant to pay money into fund for future treatment or counseling of victim, as special condition of probation)." *State* v. *McClain*, supra, 814.

[6] In *Weaver*, the court set forth what it referred to as "at least three broad rationales" for applying structural error analysis:

"First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest. This is true of the defendant's right to conduct his own defense, which, when exercised, usually increases the likelihood of a trial outcome unfavorable to the defendant. . . . That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty. . . . Because harm is irrelevant to the basis underlying the right, the Court has deemed a violation of that right structural error. . . .

"Second, an error has been deemed structural if the effects of the error are simply too hard to measure. For example, when a defendant is denied the right to select his or her own attorney, the precise effect of the violation cannot be ascertained. . . . Because the government will, as a result, find it almost impossible to show that the error was harmless beyond a reasonable doubt . . . the efficiency costs of letting the government try to make the showing are unjustified.

"Third, an error has been deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. See *Gideon* v. *Wainwright*, 372 U.S. 335, [343–45], 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (right to an attorney); *Sullivan* v. *Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (right to a reasonable-doubt instruction). It therefore would be futile for the government to try to show harmlessness." (Citations omitted; internal quotation marks omitted.) *Weaver* v. *Massachusetts*, supra, 137 S. Ct. 1908.

[7] General Statutes § 54-47a (b) provides in relevant part: "No such witness may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify or produce evidence, and no testimony or evidence so compelled, and no evidence discovered as a result of or otherwise derived from testimony or evidence so compelled, may be used as evidence against him in any proceeding, *except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony or producing such evidence* . . . ." (Emphasis added.)

[8] The fact that Harris did not testify under the penalty of perjury, despite the oath that he took in front of the jury, may also implicate the defendant's constitutional right to confront witnesses against him, as provided under the sixth amendment. See *Maryland* v. *Craig*, 497 U.S. 836, 845–46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. . . . [T]he right guaranteed by the Confrontation Clause includes not only a personal examination . . . but also . . . insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury . . . ." [Citations omitted; internal quotation marks omitted.]).

[9] Because I conclude that the trial court committed structural error by permitting the state to grant Harris immunity from any perjury prosecution related to his testimony, I need not reach the issue of whether this court should also exercise its supervisory authority to reverse the defendant's conviction and to remand the case for a new trial, or instead to set rules only for the future.